IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Karen Louise Higginbotham-Dickens, )<br><br>Plaintiff, )<br><br>vs. )<br><br>Carolyn W. Colvin, Acting<br>Commissioner of Social Security, )<br><br>Defendant. )<br>_____ ) | Civil Action No. 6:14-3528-JMC-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).

The plaintiff brought this action pursuant to Section 205(g) of the Social Security Act, as amended (42 U.S.C. 405(g)) to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for disability insurance benefits under Title II of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

The plaintiff filed an application for disability insurance benefits ("DIB") on February 17, 2011, alleging that she became unable to work on December 30, 2008 (the amended alleged onset date). The application was denied initially and on reconsideration by the Social Security Administration. On October 12, 2011, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Robert E. Brabham, Jr., an impartial vocational expert, appeared on May 16, 2013, considered the case *de novo* and, on May 31, 2013, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the

plaintiff's request for review on June 30, 2014. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

(1)    The claimant meets the insured status requirements of the Social Security Act on December 31, 2008.

(2)    The claimant did not engage in substantial gainful activity during the period from her alleged onset date of December 30, 2008, through her date last insured of December 31, 2008 (20 C.F.R §§ 404.1571 *et seq*).

(3)    The claimant had the following severe impairments: chronic migraine headaches and asthma (20 C.F.R. § 404.1520(c)).

(4)    Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).

(5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a range of sedentary work as defined in 20 C.F.R. § 404.1567(a) in that she could lift and carry up to ten pounds occasionally and less than ten pounds frequently; and stand and/or walk for no more than two hours in a workday. She could occasionally balance, stoop, kneel, crouch, and climb ramps and stairs but never crawl or climb ladders, ropes, or scaffolds. She had to avoid exposure to hazards such as unprotected heights, vibration, and dangerous machinery. She had to avoid concentrated exposure to wetness and cold temperatures. When ambulating, she required use of a cane or rolling walker.

(6)    Through the date last insured, the claimant was capable of performing past relevant work as a patient representative. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565).

(7)    The claimant was not under a disability, as defined in the Social Security Act, at any time from December 30, 2008, the

2

alleged onset date, through December 31, 2008, the date last insured (20 C.F.R. § 404.1520(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He

3

must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy.  The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments that prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See *Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)).  The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance.  If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational.  *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

4

**EVIDENCE PRESENTED**

The plaintiff was 45 years old on her amended alleged onset date and on the date last insured. She has education through two years of college and past work experience as a medic and patient representative (Tr. 248).

On February 21, 2003, the plaintiff was seen for headaches and double vision. She had unsteady gait with vertigo. She also reported memory problems. She had difficulty walking, and she felt weak (Tr. 514-15). On March 13, 2003, the plaintiff had gait ataxia, a history of a memory problems, and daily headaches (Tr. 513). On March 26, 2003, an MRI of the cervical spine showed minimal degenerative changes of the C3-4 and C4-C5 discs (Tr. 532).

Also in March 2003, Marianne Wille, D.O., and Edythe A. Browne, a registered nurse, prepared a letter and a document titled "Medical Documentation Requirements" for the human resources department of the Veterans Affairs Medical Center ("VAMC"), where the plaintiff had most recently been employed (Tr. 482-83). They noted the plaintiff's history of allergic rhinitis, asthma, and migraine headaches and indicated that her asthma and allergies were controlled with medication (Tr. 484). They indicated that the plaintiff had difficulty with her gait secondary to dizziness, but a CT scan of her head was normal. Clinical findings included a positive Romberg's test (a neurological test to detect poor balance) and an unspecified Pronator drift (a neurological test). All laboratory results were normal. They assessed the plaintiff with an inability to perform her clerical duties at the VAMC because her photophobia (light sensitivity) made her unable to work in lighted areas (*id.*).

On April 11, 2003, the plaintiff was seen again for chronic daily headaches, memory problems, gait ataxia, tremors, chronic asthma, diplopia (double vision), weakness of the extremity, persistent difficulty with walking, and persistent memory dysfunction (Tr. 512). On May 9, 2003, the plaintiff was seen by Eleanya Ogburu-Ogbonnaya, M.D., of

5

Midlands Neurology and Pain Associates, for tremors of her hands and pain in her joints. Dr. Ogburu-Ogbonnaya wanted to rule out myasthenia gravis (Tr. 511).

On May 14, 2003, Dr. Ogburu-Ogbonnaya indicated that he did not know exactly what was wrong with the plaintiff.  He recommended that she be evaluated by a psychiatrist and be referred to the Medical University of South Carolina ("MUSC") or Duke University (Tr. 510).  On June 2 and 18, 2003, the plaintiff was seen for diplopia, gait ataxia, headaches, memory problems, and tremors (Tr. 509).  On June 30, 2003, Dr. Ogburu-Ogbonnaya indicated that a test for myasthenia gravis was negative (Tr. 518, 526).  On July 28, 2003, the plaintiff continued with diplopia, difficulty walking, increased tiredness, and generalized weakness with chronic daily headaches (Tr. 507).  On October 1, 2003, the plaintiff reported that she continued to have problems with walking, and she often walked into things (Tr. 506).

On February 3, 2004, Dr. Ogburu-Ogbonnaya was unable to elicit any form of diplopia and referred the plaintiff to neuroophthalmology and MUSC Department of Neurology for a second opinion.  The plaintiff had difficulty with tandem walking, and her speech showed a mild postural tremor.  She was diagnosed with weakness, headaches, and memory problems.  She noted some occasional slurring of speech and intermittent swelling of the hands (Tr. 505).  A nerve conduction study and EMG were normal (Tr. 531).

On September 20, 2004, the plaintiff was seen for a history of diplopia with gait ataxia and migrainous headaches.  Dr. Ogburu-Ogbonnaya drafted a "To Whom It May Concern" letter stating that the plaintiff's medical condition prevented her "ability to function" (Tr. 500).

Also in September 2004, the plaintiff sought a second opinion from Paola Tumminello, M.D., a neurologist.  Dr. Tumminello adjusted the plaintiff's medication and discontinued all painkillers.  An MRI of the brain in September 2004, to assess possible

multiple sclerosis, was unremarkable and revealed no evidence of multiple sclerosis (Tr. 493-94).

On September 23, 2004, the Department of Veterans Affairs ("VA") declared the plaintiff 80% disabled with individual unemployability (Tr. 203-207).

On October 5, 2004, Annette Clark-Brown, M.D., the plaintiff's family doctor at Moncrief Army Community Hospital ("MACH") drafted a "To Whom It May Concern" letter stating that the plaintiff presented paperwork requesting documentation of her service-connected injuries and ailments in connection with her claim for benefits. Dr. Clark-Brown indicated that the plaintiff's military medical records showed problems with migraine headaches, diplopia, and an ataxic (unsteady) gait. She concluded that the plaintiff's condition was completely disabling, and the plaintiff was unable to work (Tr. 558).

On January 14, 2005, the plaintiff still experienced headaches. She would get off balance, and her face was numb. Her Topamax dosage was increased (Tr. 601). On February 4, 2005, the plaintiff was seen for diplopia, hemiparesis of left side, an ataxic gait and migraine headaches. The record indicates that multiple sclerosis was one of her diagnoses, pending a neuro-opthalmology consult (Tr. 562). On June 10, 2005, the plaintiff still had hemiparesis of the left side, an ataxic gait, migraine headaches, multiple sclerosis, and insomnia (Tr. 568-69). On August 17, 2005, the plaintiff had abdominal pain in addition to her other chronic medical problems (Tr. 571). On September 14, 2005, the plaintiff was treated for her chronic pain syndrome, abdominal pain, and insomnia (Tr. 573). On September 22, 2005, the plaintiff was seen for chronic medical problems as well as esophageal reflux (Tr. 575-77). On December 6, 2005, and January 6, January 19, and May 18, 2006, the plaintiff was seen for esophageal reflux, chronic pain syndrome, abdominal pain, insomnia, MS, diplopia, hemiparesis of the left side, an ataxic gait, and migraines (Tr. 564-82).

7

On July 25, 2006, the plaintiff saw Patrice L. High, D.O., at Rice Creek Family Medicine for asthma, migraine headaches, gastrointestinal symptoms, varicose veins, and insomnia. The plaintiff used a cane for abnormal balance (Tr. 555, 606-49). Treatment notes consistently show that the plaintiff was alert, fully oriented, and in no acute distress (Tr. 606-49). In March 2008, her asthma, gastrointestinal symptoms, and insomnia were all stable (Tr. 644). The plaintiff tolerated all of her medication without side effects. Her medications included Ambien, Singulair, Niferex, Prevacid, Advair, Topamax, Vistaril, and Ultram (Tr. 537, 538, 541, 546, 549, 551, 647).

On February 21, 2007, the plaintiff was seen by March Seabrook, M.D., at Consultants in Gastroenterology, for iron deficiency anemia and gastric ulcers (Tr. 545). On April 11, 2007, Dr. Seabrook indicated that the plaintiff had a component of irritable bowel syndrome ("IBS") (Tr. 542).

On February 11, 2008, the plaintiff was seen for dyslipidemia and pelvic pain (Tr. 646). On March 18, 2008, she reported multiple headaches recently, diagnosed as cluster headaches, but elected not to take additional medication and simply went to bed when she had a headache. She also had chronic insomnia (Tr. 644).

On February 11, 2008, the plaintiff was seen for dyslipidemia and pelvic pain (Tr. 646). On March 18, 2008, the plaintiff reported multiple headaches recently. She also had chronic insomnia (Tr. 644)

On May 20, 2008, the plaintiff reported right arm pain with a lump above her elbow that caused tingling and numbness, but no weakness (Tr. 643). An examination of her extremities showed that her grasp, sensation, and motor strength were all intact (*id.*). Later that month, the plaintiff underwent surgery to remove a benign tumor (lipoma) of her right arm (Tr. 641). In June 2008, the plaintiff's complaints concerned abdominal pain, but her gastroenteritis resolved one week later (Tr. 639-40). An upper endoscopy in September

8

2008 was "essentially normal" (Tr. 638).  Dr. High saw the plaintiff on June 17, June 26, and August 13, 2008, for chronic medical problems (Tr. 638-40).

In August 2008, the plaintiff sought treatment at the VAMC for an initial primary care visit (Tr. 468-75).   The main purpose of her visit was to seek surgical consultation for painful varicosities of her left leg (Tr. 469).   She denied any headache, abdominal pain, dizziness, numbness, or weakness.   The physician indicated that her headaches were controlled with medication at that time (Tr. 468).   The plaintiff walked with a cane.   Her memory, attention, and concentration were intact.   She had no complaints of asthmatic symptoms on her inhalers.   She was diagnosed with migraine headaches and asthma, both of which were stable, varicose veins, and worsening IBS, but no bowel changes (*id.*). On August 27, 2008, the plaintiff reported persistent upper abdominal pain (Tr. 637).

By late September 2008, Dr. High again indicated that the plaintiff was tolerating her medication without side effects (Tr. 634).  Although the plaintiff did not rest as well as she would like when taking Ambien, she did not rest at all without it (Tr. 634-35).  Dr. High indicated that the plaintiff's asthma, headaches, and gastroesophageal reflux disease ("GERD") were all stable, and her insomnia was partially controlled (Tr. 634).   In October 2008, the plaintiff sought treatment for a sore throat and achiness and to confirm that she did not have an infectious condition, as she was about to "go out of town to visit a new grandbaby" (Tr. 633).   Dr. High diagnosed her with a virus and prescribed over-the-counter medication as needed (*id.*).   At a return visit in November 2008, the plaintiff was in no acute distress and was advised to follow up in three and a half months (Tr. 632).

On December 14, 2008, the plaintiff returned to her doctors at MACH for complaints of progressive headaches over the past 24 to 36 hours and a migraine headache that began that morning (Tr. 584-86).   She had not been seen since January 2006, almost three years earlier (Tr. 580).   She complained of sensitivity to light and sound

9

and pain behind her eyes (Tr. 585). She took Topamax and Vistaril daily for migraine prevention (*id.*). She had not seen her neurologist or sought emergency room treatment for her migraines for one year (*id.*). She was treated with injections of Zofran and Demerol (Tr. 586).

On March 16, 2009, Dr. High treated the plaintiff's chronic medical problems. She also had pelvic pain (Tr. 631). On May 5, 2009, the plaintiff stated she had felt cold and suffered with myalgias for several months. She also noted blurred vision and chronic photophobia. She walked with a cane due to poor balance (Tr. 456). On June 2, 2009, an optometrist wrote that there was no known cause for the plaintiff' photosensitivity (Tr. 451-53).

On July 21, November, 12, November 24, and December 23, 2009, the plaintiff was treated for chronic medical problems. She also reported leg and foot pain and swelling, especially in her left lower extremity (Tr. 300, 621, 624, 628). On September 16, 2009, the plaintiff returned to Dr. Seabrook with dyspepsia despite taking Zantac and Nexium daily. Dr. Seabrook prescribed Kapidex (Tr. 293).

On January 25, 2010, the plaintiff began receiving mental health treatment. She ambulated with a cane due to poor balance. She had photophobia for unknown reasons. She reported feeling irritable, anxious, and helpless. She had difficulty falling and staying asleep. She reported migraine headaches and difficulty concentrating and staying focused (Tr. 423-40). On March 1, 2010, the plaintiff reported difficulty falling and staying asleep. She had decreased energy and concentration. Her judgment and insight were limited (Tr. 416-17). The plaintiff was diagnosed with adjustment disorder with depressed mood. She continued to have ongoing problems with sleep and pain. She attended individual and group mental health sessions in April, May, June, and July of 2010 (Tr. 380-408, 358-61, 340-44).

On March 19, 2010, the plaintiff reported ongoing pain in her back and legs. She had headaches and vision problems. Her asthma made it difficult to leave the house. She ambulated with a cane (Tr. 409).

On June 6, 2010, the plaintiff saw a neurologist, Anne C. Hawes, M.D., at the VAMC. The plaintiff was in moderate distress and walked with an antalgic gait and used a cane. Dr. Hawes noted that the plaintiff had tried several medications in the past without significant benefit. Physical therapy and home oxygen were prescribed (Tr. 367-68). On June 14, 2010, the plaintiff requested a referral to neurology as her migraines were not controlled. She had generalized chronic aches and pain all over her body. She had fibromyalgia with positive tender points. The plaintiff had migraines and adjustment disorder with depressed mood. She also reported poor vision and numbness in her feet and hands (Tr. 372-80). On June 17, 2010, an MRI of the brain was negative (Tr. 363). On June 18, 2010, an order for the plaintiff's home oxygen was placed (Tr. 362). The plaintiff attended physical therapy in June, July, and August 2010. A TENS unit was issued for her neck pain and headaches. At this time, the plaintiff was using a rollator to ambulate (Tr. 337, 343-47, 352).

On September 15, 2010, the plaintiff returned to see Dr. High for asthma, acute bronchitis, IBS/duodenitis, hypoxemia, and fibromyalgia (Tr. 619). On October 16, 2010, the plaintiff went to the Emergency Department for weakness in the right upper arm and difficulty ambulating. She also had a headache and dizziness (Tr. 317-322).

On January 13, 2011, the plaintiff was seen for a follow up of her chronic medical problems. She was being treated at the VA for fibromyalgia, hypoxemia, B-12 deficiency, and migraines. She was been treated by Dr. Seabrook for her IBS (Tr. 298). The plaintiff was seen on April 26, August 15, and November 28, 2011, for chronic medical problems (Tr. 611-14). On March 9 and 12, 2012, the plaintiff had abdominal pain, fibromyalgia, and chronic insomnia (Tr. 608-10). On March 27, 2012, Dr. High referred the

11

plaintiff to a neurologist. The plaintiff reported that she had been diagnosed with multiple sclerosis but had never been treated for it. She walked with a cane and had a history of migraines. She was being treated with Gabapentin for her fibromyalgia through the VA (Tr. 609). On May 16, 2012, an EGD showed esophageal dysphagia with mild gastritis and gastric polyps (Tr. 606).

On November 8, 2012, Paola Tumminello, M.D., of MUSC, wrote that the plaintiff suffered from refractory migraines with rebound headaches and an abnormal gait. She recommended ruling out multiple sclerosis. She was concerned about the plaintiff's balance problems (Tr. 493).

Elva Stinson, M.D., a state agency physician, reviewed the medical and other evidence of record on March 5, 2013, and concluded that the plaintiff would be able to perform the requirements of light work with postural and environmental limitations (Tr. 650-57).

### Hearing Testimony

During the administrative hearing in May 2013, the plaintiff testified that she was 49 years old and that she would turn 50 in about a week. She lived with her husband, her daughter, and her son. The plaintiff had completed high school and some college level work. She worked for the Army as an LPN for almost 13 years. She received medical retirement from the Army in December 1995. She was right-handed, 5'2", and weighed 127 pounds. She had gained about 22 pounds in one month due to medications and a problem with her thyroid. She had discussed this problem as well as her hair loss with her doctor at Moncrief. The ALJ noted that there were no records for the past 12 months on file (Tr. 30-34).

The plaintiff testified that she had a driver's license but rode as a passenger in a car two to three times per week to go to the grocery store or the VA. Her husband drove her to the hearing. She was able to dress and bathe herself without assistance,

12

although she said that sometimes she passed out in the bathroom and needed help. She passed out three or four times while in the bathroom, the last time being two months prior to the hearing. The plaintiff stated that her husband did a lot of things around the house, including the laundry. She had some difficulty recalling her abilities in 2008, but guessed that she did few household chores and went to the grocery store with her husband. She did not help mop, sweep, or vacuum because cleaning aggravated her asthma. She stated she did not do dishes in 2008 because she had a hard time getting around and she had headaches. If she had to bend over or try to pick something up she would get migraines (Tr. 35-38).

The ALJ asked about treatment for migraines. The plaintiff had a neurologist. She took Topamax and Vistaril daily for migraine prevention. The last record from the neurologist and the last hospital visit for migraines were one year prior to the hearing. The plaintiff testified that she went to Urgent Care to get treated. She had seen a civilian doctor, but he was not cooperating with the doctors at the VA, so they sent her to MUSC. She saw a doctor at MUSC for a couple of months, and she changed her medications. Then she returned to the VA neuro-opthalmology department, and they indicated that she might have multiple sclerosis. One doctor indicated that the plaintiff had rebound headaches from her pain medications, and she took her off the pain medications. At that time, the plaintiff was diagnosed with migraines, and the doctor indicated that she could not go back to work. With her counsel's confirmation, the plaintiff appeared to agree that no doctor had confirmed a diagnosis of multiple sclerosis (Tr. 39-42).

When the ALJ asked the plaintiff if she had used a computer in 2008, the plaintiff testified that she had not because she had forgotten how to do so, even though she had used a computer in her job four years earlier (Tr. 64). The plaintiff estimated that in 2008, she would have had difficulty lifting a gallon of milk due to poor grip strength (Tr. 65). She testified that she would have been unable to walk one block due to asthma and leg

pain, or sit for more than twenty minutes due to low back and leg pain (Tr. 66-67).  She said her medication made her "tired and stuff" (Tr. 69).

At the hearing, the vocational expert classified the plaintiff's job as a medical clerk as semi-skilled, light work; her job as a medical assistant as skilled, light work; and her job as a patient representative as skilled, sedentary work (Tr. 74). The ALJ asked the vocational expert to consider an individual of the plaintiff's age, education, and work history, who could perform sedentary work (i.e., lifting up to ten pounds occasionally and less than ten pounds frequently; and standing and walking for a total of two hours in an eight-hour workday) with only occasional stooping, balancing, crouching, kneeling, or climbing of stairs or ramps; no crawling or climbing of ladders, ropes, or scaffolds; no exposure to unprotected heights, vibration, or dangerous machinery; and no concentrated exposure to extremes of wetness or cold temperatures (Tr. 75-76). The vocational expert responded that such an individual would be able to perform such work as the plaintiff's past work as a patient representative (Tr. 77).  The vocational expert further confirmed that use of a cane or a rolling walker would not affect the ability to perform the job of patient representative (*id.*).

The ALJ asked if, due to recurrent or chronic diplopia, double vision, or blurred vision, the individual was not able to perform tasks that required constant fine visual activity, such as working with columns of numbers or reading print smaller than 12-point type, how the ability to perform the job of patient representative would be impacted.  The vocational expert stated that it would eliminate the job of patient representative and all sedentary positions, in particular semi-skilled or skilled positions (Tr. 77-78).

The vocational expert  testified that if the individual missed work three days out of the month due to fatigue or chronic pain, she would be unable to perform gainful employment.  If she were off task 15% of the day due to inability to concentrate, it would be inconsistent  with gainful employment at virtually any skill or exertional level (Tr. 78).

14

## ANALYSIS

The plaintiff argues that the ALJ erred by (1) failing to properly consider the VA disability rating decision; (2) failing to perform the proper analysis of the treating and evaluating physicians' opinions; (3) failing to properly consider evidence from after the date last insured regarding her fibromyalgia; (4) failing to properly consider her insomnia; and (5) failing to properly evaluate her credibility.

### *VA Decision*

The plaintiff argues that the ALJ erred in failing to properly consider the VA's determination that she was 80% disabled (pl. brief 29-31). As noted above, on September 23, 2004, the VA declared the plaintiff 80% disabled with individual unemployability (Tr. 203-42). The VA explained that the decision was based upon the "evidentiary record and to include effects of migraine headaches on ability to retain employment. This evidence shows you are evaluated as 50 percent disabled due to migraine headaches with debilitating asthma along with numerous other service connected disabilities that would preclude employment" (Tr. 204). The ALJ acknowledged the VA's decision, along with the Army's November 1995 decision rating the plaintiff with a 30% disability (Tr. 192-94), and noted that the decisions had been considered along with all the other evidence of record (Tr. 17). The ALJ stated as follows:

> The laws defining "disability" for military disability and veteran's programs are based on a percentage schedule for rating disabilities. That definition is not consistent with the definition of "disability" in the Social Security Act, and the determination of the Department of the Army and the Department of Veteran's Affairs are not binding on me in applying the law governing this claim (20 C.F.R. §§ 404.1504, 416.904). I do not find those determinations to be worthy of significant weight in evaluating the claimant's disability under the Social Security Act for the relevant period.

(Tr. 17).

15

The ALJ's decision, which is dated May 31, 2013, was made several months after the decision in *Bird v. Comm'r*, 699 F.3d 337 (4th Cir. 2012) by the Court of Appeals for the Fourth Circuit, in the which the court found as follows:

> The VA rating decision reached in Bird's case resulted from an evaluation of the same condition and the same underlying evidence that was relevant to the decision facing the SSA. Like the VA, the SSA was required to undertake a comprehensive evaluation of Bird's medical condition. Because the purpose and evaluation methodology of both programs are closely related, a disability rating by one of the two agencies is highly relevant to the disability determination of the other agency. Thus, we hold that, in making a disability determination, the SSA must give substantial weight to a VA disability rating. However, because the SSA employs its own standards for evaluating a claimant's alleged disability, and because the effective date of coverage for a claimant's disability under the two programs likely will vary, an ALJ may give less weight to a VA disability rating when the record before the ALJ clearly demonstrates that such a deviation is appropriate.

*Bird*, 699 F.3d at 343.

The plaintiff argues that, under *Bird*, the ALJ cannot simply cite the fact that the VA is a different agency as a basis for dismissing the opinion and instead must give the VA determination substantial weight unless he can clearly demonstrate that a deviation from the opinion is appropriate (pl. brief 30). The undersigned agrees. The ALJ did not discuss in any detail why or how he assigned weight to the VA rating decision; instead, the ALJ simply dismissed the import of the VA decision in a conclusory fashion for being made by another governmental agency and not based on Social Security law. *See Gilliard v. Colvin*, C.A. No. 8:14-1290-RMG, 2015 WL 4661822, at *11 (D.S.C. Aug. 4, 2015) (remanding for evaluation of VA ratings in accordance with the *Bird* standard). Like the plaintiff in *Bird*, the plaintiff here has a substantial VA disability rating, and it appears that the VA rating decision is based on the same conditions relevant to the Social Security decision. However, the ALJ's decision "does not indicate that . . . [the ALJ] considered 'substantial weight' to be the starting point for weight give[n] to VA ratings." *McClora v.*

16

*Colvin*, C. A. No. 5:14–cv–441–DCN, 2015 WL 3505535, at *16 (D.S.C. June 3, 2015). Furthermore, the ALJ's discussion "does not 'clearly demonstrate' that . . . a deviation from a finding of substantial weight is appropriate." *Id*. (quoting *Bird*, 699 F.3d at 343). Accordingly, the undersigned recommends that this case be remanded with instructions for the ALJ to follow the specific method for weighing VA disability ratings prescribed in *Bird*. *See Sims v. Colvin*, C.A. No. 2:14-CV-03005-TLW, 2015 WL 5474760, at *6 (D.S.C. Sept. 17, 2015). In recommending remand, the undersigned does not intend to suggest that the ALJ's RFC finding could not be sustained under the new standard, only that discounting the VA's ratings requires greater explanation under *Bird*. *See Cobbs v. Colvin*, C.A. No. 1:12-CV-03472-JMC, 2014 WL 468928, at *8 (D.S.C. Feb. 4, 2014) (remanding for evaluation of VA ratings in accordance with the *Bird* standard).

### *Remaining Allegations*

In light of the court's recommendation that this matter be remanded for further consideration of the VA disability decision as discussed above, the court need not address the plaintiff's remaining allegations of error as they may be rendered moot on remand. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir.2003) (remanding on other grounds and declining to address claimant's additional arguments). However, as part of the overall reconsideration of this claim upon remand, the Commissioner should reconsider the opinions of Drs. Ogburu-Ogbonnaya, Wille, and Clark-Brown (pl. brief 24-29); the primary evidence regarding the plaintiff's fibromyalgia from past the date last insured, as appropriate under *Bird*, 699 F.3d at 340-41 (*id.* 31-33); the plaintiff's insomnia and the fatigue associated with it in combination with her other severe and non-severe impairments (*id.* 33-34); and the plaintiff's credibility (*id.* 34-35).

### CONCLUSION AND RECOMMENDATION

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and

that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

December 2, 2015
Greenville, South Carolina